In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 25-1691

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAWN PENA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00858 — **Martha M. Pacold**, *Judge.*

_____

ARGUED OCTOBER 29, 2025 — DECIDED AUGUST 5, 2026

_____

Before SYKES, ST. EVE, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* After Shawn Pena violated numerous conditions of his supervised release, the district court revoked his supervision. Although Pena and the government jointly recommended a 14-month revocation sentence, the district court imposed a 24-month sentence, followed by one year of supervised release. Pena appeals, challenging various aspects of the revocation hearing, the government's compliance with the plea agreement, the district court's

considerations in determining his sentence, and the constitutionality of one condition of supervised release. We affirm the revocation sentence, but we vacate the supervised release condition and remand for further clarification.

**I**

In 2021, Shawn Pena pleaded guilty to conspiracy to engage in interstate transportation of stolen goods, 18 U.S.C. §§ 371, 2314. He was sentenced to 37 months' imprisonment, followed by 36 months of supervised release. Pena's supervised release began in June 2023.

In January 2024, Pena's probation officer submitted two reports to the district court alleging that Pena violated multiple release conditions: He was arrested in Indiana for two thefts and did not notify probation; he travelled outside the Northern District of Illinois without permission; he failed to advise probation of his new address; and he associated with a known felon. When Pena did not appear at a January 2024 hearing to address these alleged violations, the court issued a warrant for his arrest.

Pena remained a fugitive for over a year until April 7, 2025, when he was arrested in West Chicago, Illinois on new charges of criminal damage to property, resisting an officer, and fleeing police in a motor vehicle. Probation reported this additional violation to the district court.

Two days after this arrest, Pena appeared in the district court, and, through counsel, confirmed that he reviewed the January 2024 violation reports. After the district court summarized all the violations alleged in the then-three pending reports, Pena's counsel agreed that the court need not provide additional details and stated that Pena was not requesting a

preliminary hearing. Counsel then conferred with Pena and requested to continue the revocation hearing.

The next day, April 10, 2025, probation filed yet another report, alleging three new violations stemming from yet another arrest in Wisconsin in June 2024: theft, travelling outside the District without permission, and associating with a known felon.

At the start of the continued revocation hearing on April 16, 2025, the district court asked if Pena had received probation's April 10 violation report. Pena had not, but his counsel said she had received it along with the police reports related to the West Chicago arrest. She confirmed that she had discussed the April 10 report with Pena over the phone, and she brought copies of the violation reports and police reports to the hearing for him. At the court's request, the probation officer summarized the police reports from the West Chicago incident, detailing that Pena had fled during an attempted traffic stop, barricaded himself in a gas station bathroom, and hid in and fell through ceiling tiles, injuring an officer. The court asked Pena how he wished to proceed and if he "need[ed] any more time?" After a short recess to discuss with his counsel, Pena declined the court's offer, electing to proceed with the hearing.

Pena's counsel explained to the court that Pena and the government had come to an agreement under which Pena would admit to four lower-level (Grade C) violations, and the government would dismiss the remaining alleged violations, including those related to Pena's multiple theft arrests. The guidelines' policy range for the admitted violations was 8–14 months, and Pena's counsel explained that the parties agreed that a 14-month sentence would be appropriate. Pena's

counsel further expressed that no additional term of supervision would be needed.

The government confirmed that 14 months would be a "reasonable resolution to this matter" and an "appropriate use of resources." The government also "acknowledge[d] that probation does not agree it's a reasonable resolution," in large part because of Pena's "terrible record" that has continued even after the age of 40, and "that the Court [in its discretion] can go over the 14 months." But ultimately, the government agreed "that [defense counsel] is right" and that courts do not usually "go[] over the range on Grade C violations." The government parted ways with Pena on the question of supervised release, recommending one year.

In contrast, probation recommended the statutory maximum sentence of 24 months, followed by one year of supervised release. At the hearing, the probation officer argued that Pena posed a risk to the community and to businesses and opined that "eventually somebody is going to get hurt." She acknowledged that the theft-related violations were being dropped but stated that "Pena has a history since he was 18 years old of traveling across the country and committing thefts." She also pointed out that Pena had been a fugitive outside of the district for the prior 15 months with no contact with probation. Pena's counsel objected that probation should not "have an adversarial role in the supervised release revocation process and should not be perceived as surrogate prosecutors." The government responded that probation was simply "conveying to the Court their neutral opinion of what they're seeing in supervising this defendant."

The district court agreed with the government and probation that a year of additional supervised release would be

appropriate based on Pena's "long criminal history . . . of basically traveling around the country and committing thefts." The court also agreed that Pena's lengthy lack of contact with probation "increase[d] the risk to the community." And, it continued, additional supervision would hopefully help "maximize" Pena's chances of reintegration and rehabilitation.

Pena's counsel objected to one of the supervised release conditions as unconstitutionally vague. Special Condition 13 required that if Pena's probation officer determined he was "a risk to another person," the officer could require Pena to "tell the person about the risk." Pena's counsel argued that the condition was "vague in the way that it's worded" and was not "properly keyed to the facts here" because there were no individual victims in the case. The district court overruled the objection, noting Pena's lengthy criminal history, "repeated pattern of arrests," and "sheer number of police contact[s]."

The district court then settled on a 24-month sentence of incarceration. Its primary reason for going above the parties' recommended sentence was "the risk to the community." It again voiced concerns about Pena's extensive criminal history and pattern of conduct. And, discussing the West Chicago police report, the court emphasized the dangerousness of the conduct alleged in the dismissed violations. The court acknowledged that "it's rare to go above guidelines for Grade C violations," but it felt that doing so here was justified "based on the danger to the community."

Before imposing the sentence, the court asked if the defense had "any objections to the procedure so far." Pena's counsel responded, "No." At the end of the proceeding, the district court again asked if Pena had "any objections or

arguments" that were not adequately addressed. Pena's counsel again answered no.

## II

On appeal, Pena brings multiple challenges to his revocation sentence. He argues that the district court should not have considered the police reports related to the dismissed theft violations, that the prosecution breached its plea agreement, that the district court improperly considered retribution when determining his sentence, and that Special Condition 13 is unconstitutional. We address each argument in turn.

## A

Pena raises several different arguments related to the police reports that were discussed at his revocation hearing. None of them is availing.

First, Pena argues that he did not receive sufficient advance notice of the April 2025 police reports to prepare a defense, which violated his due process rights and FED. R. CRIM. P. 32.1(b)(2)'s disclosure, written notice, and cross-examination guarantees. But Pena explicitly waived these arguments by agreeing to move forward with the revocation hearing. "Waiver occurs when a party intentionally relinquishes a known right[.]" *United States v. Harris*, 102 F.4th 847, 851 (7th Cir. 2024) (citing *United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019)). The court asked Pena if he needed more time to review the reports, and he chose instead to proceed. Declining the offer of more time to prepare is quintessential waiver of the Rule 32.1(b)(2) disclosure and notice requirements. *See id.* at 850–51. For the same reasons, Pena also waived his opportunity to challenge the accuracy of

the reports through cross-examination of the officers. *See id.*; FED. R. CRIM. P. 32.1(b)(2)(C).

Second, Pena argues that because the parties agreed to dismiss the theft violations, the district court violated the party presentation principle by considering the related police reports. Under that principle, "we rely on the parties to frame the issues for decision" and limit courts to deciding "only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020). But this principle is simply inapplicable here. The court did not answer an unasked question, such as whether the dismissed violations actually occurred, when it considered the police reports. Instead, the court's use of the reports was limited. The court considered the West Chicago reports, which noted that a police officer was injured in the incident, alongside Pena's supervised release violations and his criminal history to determine whether Pena posed a danger to the community. And public safety was a permissible factor for the court to consider when deciding the appropriate sentence for the admitted violations. *See* 18 U.S.C. §§ 3583(c), 3553(a)(2)(C).

Third, Pena suggests that the district court improperly presumed that the allegations in the police reports were reliable, arguing that reliability of the reports was never established. But a sentencing court has wide discretion to consider a defendant's criminal history, including police reports, when the information has "sufficient indicia of reliability to support its probable accuracy" and "the defendant has failed to object to th[e] underlying facts." *United States v. Mansfield*, 21 F.4th 946, 957 (7th Cir. 2021) (quoting *United States v. Guajardo-Martinez*, 635 F.3d 1056, 1059 (7th Cir. 2011)). The police reports here "at least arguably

contain[ed] reliable information about [Pena]'s prior similar adult conduct" and Pena did not object to facts within them. *See id.* In fact, Pena himself corroborated the reports in part, noting that he was also injured during the West Chicago incident. Thus, it was not error for the court to consider the reports.

**B**

Next, Pena argues that the government breached its agreement to jointly recommend a 14-month sentence when it (1) told the district court that it had the discretion to impose a higher sentence, and (2) did not oppose probation's 24-month recommendation. Although the government's advocacy for the agreed-upon sentence was arguably tepid and often focused on aggravating factors, its conduct did not amount to a breach of the agreement.

Because Pena failed to raise this challenge in the district court, it is forfeited, and we review for plain error. *See United States v. Taylor*, 909 F.3d 889, 893 (7th Cir. 2018) (citing *Puckett v. United States*, 556 U.S. 129, 135–36 (2009)). Thus, Pena can only prevail if "there was [an] error; the error was plain or obvious; the error affected his substantial rights; and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Orlando*, 823 F.3d 1126, 1134 (7th Cir. 2016) (alteration in original).

Here, there was no error—plain or otherwise. First, the fact that the government reminded the district court that it had discretion to impose a sentence greater than 14 months is not indicative of a breach. The government's recognition of a basic legal principle was not an invitation for the court to stray from the agreed-upon recommendation. *See United*

*States v. Hauptman*, 111 F.3d 48, 51 (7th Cir. 1997); *compare United States v. Diaz-Jimenez*, 622 F.3d 692, 696 (7th Cir. 2010) (finding breach when government stated, "I suppose a larger sentence could be appropriate," and that the lower sentence was the "least amount that is necessary[.]").

Second, the government's failure to oppose the recommendation by probation is neither here nor there. Probation was entitled to make its own recommendation, separate from the government's. *See United States v. Veteto*, 945 F.2d 163, 166 (7th Cir. 1991) (noting that probation "acts as an arm of the court" and has a duty to "make a recommendation to the judge"). The government was not obligated, by the terms of the agreement or otherwise, to push back against probation's recommendation. Further, the prosecutor's discussion of aggravating sentencing factors when she acknowledged the reasoning underlying probation's recommendation did not constitute breach. *See Campbell v. Smith*, 770 F.3d 540, 548 (7th Cir. 2014) (citing *United States v. Benchimol*, 471 U.S. 453, 455–56 (1985)) ("The Constitution does not require that a prosecutor 'enthusiastically' make an agreed-upon sentencing recommendation."); *see also United States v. Rachuy*, 743 F.3d 205, 209 (7th Cir. 2014) (no breach where government "never advocated for a higher sentence" and repeatedly recommended the agreed-upon sentence, despite referencing defendant's criminal history).

Pena also argues that the probation officer improperly acted as an advocate and "took on an adversarial role" at the hearing. We disagree. Probation officers are "neutral information gatherer[s]," *United States v. White*, 868 F.3d 598, 604 (7th Cir. 2017), who "compile information and make [] recommendation[s] to the judge," *Veteto*, 945 F.2d at 166. While we

have cautioned that probation officers may "not take on the role of an adversary[,]" the officer here did not cross that line. *See United States v. Peterson*, 711 F.3d 770, 778 (7th Cir. 2013). She made no "inflammatory and unprofessional statements." *See White*, 868 F.3d at 604. Nor did her statements "find[] scant support in the record." *See id.* Rather, the officer highlighted the 15 months that Pena was a fugitive and his long criminal history, all facts within the record. And, based on those patterns and her experience, the officer opined that Pena posed a risk to the community. We see nothing inappropriate in those comments.

## C

Pena next contends that the district court improperly considered retributive factors when determining his revocation sentence. The parties disagree on the proper standard of review, but the district court did not err under any standard, so we need not resolve that dispute. Even under de novo review, the district court did not consider retribution when determining Pena's sentence.

Under 18 U.S.C. §§ 3583(c), (e)(3), a court may sentence a defendant to a term of imprisonment upon revocation of supervised release after considering deterrence, public safety, and rehabilitation. But courts may not consider the retributive factors of § 3553(a)(2)(A) in revocation proceedings, such as the need for the sentence imposed to reflect the seriousness of or provide just punishment for the "underlying crime of conviction," or to promote respect for the law. *Esteras v. United States*, 606 U.S. 185, 193–97 (2025).

Pena argues that the district court considered his underlying conviction when it cited to his history of thefts and

discussed the dangerousness of such conduct. According to Pena, dangerousness was a proxy for the seriousness of his original crime. He says that the court also considered the need to promote respect for the law when discussing how Pena's thefts were repeated behavior. In his view, this discussion implied that he did not respect the law.

We disagree with Pena's characterization of the district court's considerations. The court focused on the need to protect the public and deterrence, not retribution. It repeatedly aired concerns about the "risk" Pena posed to others, explicitly noted the need to consider "the protection of the public," and stated that its decision to impose a 24-month sentence was based "primarily [on] the risk to the community." And although the court emphasized that Pena's previous thefts were of a "very dangerous" nature, it did not say that Pena should be punished because of that. Instead, it found that the dangerousness of his prior conduct and his recent actions indicated that "someone will get hurt." The court also appeared concerned about deterrence, pointing out the lengthy and repetitive nature of Pena's conduct, and expressed a desire to help him avoid "slipping back into this pattern."

In short, nothing in this record suggests that the district court's sentencing decision was motivated by retribution rather than deterrence and public safety.

## D

Finally, Pena challenges Special Condition 13, which states that Pena may be required to notify third parties of "risks" if and when his probation officer determines that he is "a risk to another person." Pena says this requirement is

unconstitutionally vague, improperly delegates judicial power to a probation officer, and unconstitutionally compels speech.

We can begin and end with vagueness because we have already found similarly worded conditions to be unconstitutional based on the potential breadth of terms like "risks" and "third parties" (or in this case, "another person"). *See, e.g.,* *United States v. Greco*, 938 F.3d 891, 897 (7th Cir. 2019); *United States v. Bickart*, 825 F.3d 832, 841–42 (7th Cir. 2016). The government concedes that a limited remand is necessary to modify this condition. We agree. On remand, the district court should "recast the condition in more concrete terms." *See Greco*, 938 F.3d at 897.

## III

We VACATE the challenged condition of supervised release and REMAND for the limited purpose of addressing that condition of supervised release. The 24-month prison sentence and 12-month supervised release terms are AFFIRMED.